FILED

2017 Feb-24  PM 03:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **VICKIE THROWER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 5:14-CV-02490-CLS** |
| | ) | |
| **Y E D L A   M A N A G E M E N T COMPANY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Vickie Thrower, a white female, alleges that defendant, Yedla Management Company, Inc., discriminated against her on the basis of her gender and race, fostered a hostile work environment, and retaliated against her for engaging in protected conduct, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.[1]  Those claims are before the court on defendant's motion for summary judgment (doc. no. 21).[2]  Upon consideration of the pleadings, briefs, evidentiary submissions, and arguments of counsel, the court concludes that the motion should be granted.

---

[1] *See* doc. no. 1 (Complaint), ¶¶ 14, 15.

[2] Defendant also filed a motion *in limine* (doc. no. 27), and a motion to strike plaintiff's affidavit (doc. no. 36), which are addressed in a separate order entered contemporaneously herewith.

# I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party

for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).   *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF RELEVANT FACTS

Yedla Management Company, Inc. ("Yedla Management"), is an Alabama corporation headquartered in Madison County, Alabama.[3]   It is a "hospitality management company," meaning that it enters into "contractual relationships with the owners of hotels to 'manage' the day to day operations" of facilities providing accommodations and meals for travelers.[4]  On the dates of the events leading to this action, Yedla Management supervised the operations of at least five hotels, including the "DoubleTree Suites by Hilton Huntsville-South," the facility at which plaintiff worked as general manager for approximately seven months during 2012.[5]  That hotel

---

[3] Doc. no. 22-2 (Yedla Affidavit), ¶ 4.

[4] *Id.*, ¶ 5.

[5] During arguments on the present motion, defense counsel identified the hotels as:  (1) the DoubleTree Suites by Hilton Huntsville-South; (2) the Hampton Inn located behind the foregoing hotel; (3) the Springville Suites behind the Von Braun Civic Center in downtown Huntsville, Ala.; (4) the Courtyard in Decatur, Ala.; and (5) the Hampton Inn in Florence, Ala.  In addition, Yedla Management also may have managed an additional three hotels in 2012:  *i.e.*, the Westin in Orlando, Fla.; a Marriott property in Charlotte, N.C.; and another Marriott property in Anchorage, Ak.

was owned by Enterprise Lodging of Huntsville, L.L.C. ("Enterprise Lodging"), a

Delaware limited liability company that is qualified to conduct business in Alabama.[6]

Enterprise Lodging is not now, nor has it ever been, a party to this action.

## A.   The "Project Management Agreement"

Yedla Management entered into a "Project Management Agreement" with

Enterprise Lodging on March 13, 2001,[7] under the terms of which Yedla Management

was required "to provide development, managerial, design, construction, operation,

and administrative services in connection with the development and operation of" one

of more hotels on a tract of land in Huntsville, Alabama owned by Enterprise

---

Finally, the company will manage the operations of two other Huntsville hotels that still were under construction on the date of oral argument on the subject motion: *i.e.*, the Townhouse Suites at Redstone Arsenal Gate 9; and the AC hotel next to Big Spring Park, on the site of the former Huntsville Hilton Inn that was demolished in 2015-16.

[6] *Compare* doc. no. 22-2 (Yedla Affidavit), ¶ 7 (swearing that "[t]he Hotel is owned by Enterprise Lodging of Huntsville, LLC . . . *an Alabama limited liability company*.") (alterations and emphasis supplied), *with* doc. no. 43-1 (Project Management Agreement between Yedla Management and Enterprise Lodging), at 6 (where Enterprise Lodging— identified as the "Hotel Group" — "represents and warrants that . . . It is a limited liability company duly organized and validly existing in good standing under the laws of the State of Delaware . . .; [and that it] is duly qualified to do business in the State of Alabama. . .") (alterations and ellipses supplied).

[7] The date stated in text is taken from the preamble of Yedla Management's "Project Management Agreement," a copy of which was filed following oral arguments on the present motion for summary judgment. *See* doc. no. 43-1 (Project Management Agreement between Yedla Management and Enterprise Lodging), at 1. That date is contradicted by Satya Yedla's affidavit, which states that "Since *February 26, 2001*, YMC has [held] a contract for the management of the DoubleTree Suites Huntsville South (formerly the Radisson Huntsville South) located at 6000 Memorial Parkway S.W., Huntsville, Alabama. . . ." Doc. no. 22-2 (Yedla Affidavit), ¶ 6 (emphasis, ellipsis, and alterations supplied).

Lodging.[8]  The agreement required Yedla Management to "be responsible for all management operation[s] and administrative services necessary to operate" any hotel constructed on the property:  a requirement that included the responsibility to "Supervise, manage, *hire and discharge* [hotel] *personnel, all of whom shall be deemed to be employees of the Hotel Group* [*i.e.*, Enterprise Lodging]."[9]

The first hotel constructed on the land owned by Enterprise Lodging was operated for many years as a "Radisson®" franchise under the name of "Radisson Huntsville South."[10]  That hotel was closed in November of 2011, however, in order to facilitate remodeling work necessary to re-brand the facility as a "DoubleTree

---

[8] Doc. no. 43-1 (Project Management Agreement between Yedla Management and Enterprise Lodging), at 1.

[9] *Id*. at 2, § 3(a)(*v*) (alterations and emphasis supplied).  The relevant text of that provision states:  "Management Company [*i.e.*, Yedla Management] shall be responsible for all management operation and administrative services necessary to operate the Project.  Without limitation of such responsibilities, Management Company shall:  . . .  (v)  *Supervise, manage, hire and discharge Project personnel, all of whom shall be deemed to be employees of the Hotel Group*; . . . ."  *Id*. (alteration, ellipses, and emphasis supplied).  In addition, Section 4(b) of the same agreement directed Yedla Management to:

> Furnish to Hotel Group [*i.e.*, Enterprise Lodging] an annual financial statement of Project operations prepared or reviewed (at the sole cost and expense of Hotel Group) by a finn [*sic*] of accountants chosen by the Management Company.  The entire cost of all expenses of the business of Hotel Group (other than salaries of Management Company employees) including, without limitation, the cost of business licenses, taxes, insurance premiums, utilities, janitorial, food, occupancy beverages, payroll serving, *salaries of employees at the Project*, office supplies, advertising, and legal and outside accounting fees for services rendered to Hotel Group *shall be paid by Hotel Group*.

*Id.* at 3 (alterations and emphasis supplied).

[10] *See* doc. no. 22-2 (Yedla Affidavit), ¶ 6 (quoted in note 7, *supra*).

Suites by Hilton" hotel[11]   All employees of the former Radisson hotel were

terminated,[12] and normal operations ceased during the work, which included a "major

structural overhaul" and "a lot of construction and additions and changes."[13]

## B.   Plaintiff's Employment as General Manager

Plaintiff, who had many years of experience in the hotel industry,[14] initially was

identified as a candidate to become general manager of the remodeled DoubleTree

Suites by Hilton hotel by Srinath Yedla, an ethnically-Indian resident of Huntsville,

Alabama, who — along with his father, Dr. K. Rao Yedla, and brother, Satya Yedla

— is one of the owners of Yelda Management.[15]

An offer of employment was extended to plaintiff in a March 11, 2012 letter

---

[11] *See* doc. no. 22-2 (Yedla Affidavit), ¶ 8 ("In 2011, Enterprise Lodging took out a loan for roughly seven million dollars ($7,000,000.00) to finance the remodeling, rebranding, and reopening of the Hotel as a DoubleTree Suites.").

[12] *See* doc. no. 22-2 (Yedla Affidavit), ¶ 9 ("In November 2011, all the employees of the Hotel were terminated and the Hotel ceased operations altogether to facilitate remodeling construction.").

[13] *See* doc. no. 31 (Plaintiff's Brief:  Statement of Undisputed Facts), ¶ 2.

[14] *See* doc. no. 22-1 (Plaintiff's Deposition), at 16-18.  Plaintiff previously had been employed as general manager of a Hilton Garden Inn and a Homewood Suites hotel in the Huntsville market, and each facility was a "full-service hotel," meaning that each maintained rooms for rent and an onsite restaurant. *Id.* at 20-21.  She also had worked for ten years at the Huntsville Marriot hotel located adjacent to the Alabama Space and Rocket Center, another "full-service hotel," but not as general manager. *Id.*

[15] *See* doc. no. 22-2 (Yedla Affidavit), ¶ 2.  It is clear that at some times during plaintiff's employment at the hotel, Srinath Yedla possessed authority over plaintiff's work. *See* doc. no. 22-11 (Yedla Deposition), at 71.  Satya Yedla testified that it was his brother, Srinath Yedla, who "thought that [plaintiff] would be a good solution to getting a GM in place quickly." *Id.* at 19 (alteration supplied).

from Stuart R. Newmark, Yedla Management's Executive Vice President for Operations.[16]  The letter was typed on stationery bearing the name and corporate logo of Yedla Management, and read as follows:

> Dear Vickie,
>
> It is my pleasure to extend the following offer of employment to you on behalf of the DoubleTree Suites Huntsville-South in Huntsville, Alabama.
>
> Position:  General Manager
>
> Reporting Relationship:  *This position will report to the Executive Vice President of Operations for Yedla Management Company.*
>
> Base Salary: [$]83,076.93 gross paid bi-weekly, which annualizes to $80,000 per year gross.  This position is a salaried exempt position.[17]
>
>     . . . .
>
> Your Employment with *the Company*:  Employment in the state of Alabama is "At Will".  You and *the company* can terminate employment at anytime with or without cause and with or without notice.
>
> You acknowledge that this offer letter, [*sic*] (along with the final form of any referenced documents) represents the entire agreement between you and *the Company* and that no verbal or written agreements, promises or representations that are not specifically stated in this offer, are or will be binding upon *the Company*.  In addition this offer is contingent upon a satisfactory background and credit check.

---

[16] *See* doc. no. 32-1 (Plaintiff's Affidavit), ¶ 1.

[17] Plaintiff testified that typically a general manager would make a higher salary than she was paid "[f]or that type of hotel."  Doc. no. 22-1 (Plaintiff's Deposition), at 33 (alteration supplied). Even so, when asked if she could believe that her salary was the highest ever paid at the DoubleTree, plaintiff responded:  "I can believe that."  *Id.*

If you are in agreement with the above outline, please sign below.  This offer is in effect for five business days.

This is an exciting and dynamic project and one that requires a committed and seasoned General Manager.  We are confident Vickie that with your background, experience and proven track record in the Huntsville market that you can lead the hotel to the desired targets in all areas.

*We all look forward to welcoming you to Yedla Management Company* and to the DoubleTree Suites Huntsville-South.

Doc. no. 32-1 (Plaintiff's Affidavit), at ECF 3 (Employment Offer) (underscored text in original, *italicized emphasis*, ellipsis, footnote, and alterations supplied).  Plaintiff endorsed her acceptance of the offer on March 15, 2012.[18]

## C.   **Hotel Revenues During Plaintiff's Tenure as General Manager**

When plaintiff reported for work as general manager,[19] remodeling work still was ongoing and the hotel was not open for business.[20]  Guest room rentals did not

---

[18] *See* doc. no. 32-1 (Plaintiff's Affidavit), at ECF 3 (Copy of Plaintiff's Contract).

[19] *Apparently*, plaintiff did not actually begin work as general manager until on or about April 17, 2012, one month after accepting Stuart Newmark's offer of employment.  *See* doc. no. 22-2 (Yedla Affidavit), ¶ 13 ("On or about April 17, 2012, the Plaintiff, Vickie Thrower[,] was hired by Enterprise Lodging to serve as the Hotel's General Manager.") (alteration supplied).

[20] As plaintiff explained during her deposition:

The state of the hotel was . . . a train wreck from being remodeled.  There was a lot of work to do.  It was pretty much an inside shell that they were still working on when I was hired.  There was a lot of renovation going on inside the hotel.  So when I was hired, there was a lot of work to do.  Had to clean and — We had to clean.  We had to get people in there and a staff that would know what to do.

Doc. no. 22-1 (Plaintiff's Deposition), at 17-18 (ellipsis supplied); *see also id*. at 19.

resume until sometime around the middle of August 2012.[21]

Despite a "rocky start"[22] — which included a collapse of the roof over the hotel's fitness and business centers on the date of reopening, the fact that half of the 149 guest rooms "weren't put together correctly," and "a lot of things [still] needed to be redone"[23] — plaintiff described the hotel's initial performance during the remainder of August as "great," and the income generated during that partial month of operations as "very good":

> The hotel was doing *great*. You know, I was having to put in a lot of hours. The housekeeping manager was putting in a lot of hours to make it good. There were several guest issues. But as far as the money that we were making, it was *very good*. . . . That's because the ADR [Average Daily Rate[24]] was high. *So the hotel was doing very well performancewise.*

Doc. no. 22-1 (Plaintiff's Deposition), at 37, 38 (emphasis, ellipsis, alteration. and footnote supplied). Plaintiff's stated opinions were subjective, as compared to more objective metrics for measuring hotel performance that were utilized by Yedla Management: *e.g.*, comparing monthly rental receipts to pre-determined revenue

---

[21] *See id*. at 98; and doc. no. 22-2 (Yedla Affidavit), ¶ 21 ("The grand re-opening of the Hotel occurred on or about August 14, 2012.").

[22] Doc. no. 22-1 (Plaintiff's Deposition), at 37.

[23] *Id*. at 35-36 (alteration supplied).

[24] A hotel's average daily rate ("ADR") is a measure of the average rate paid for hotel rooms, calculated by dividing gross room revenue by the number of rooms sold. It is a statistical unit widely used in the hospitality industry to indicate the average realized daily room rental revenue. *See*, *e.g.*, http://www.strglobal.com/Media/Default/Documents/Definitions.pdf; and http://www. investopedia. com/terms/a/average-daily-rate.asp.

projections.  Plaintiff participated in the discussions that resulted in those revenue targets,[25] and monitored monthly profit and loss reports.[26]

The hotel's gross room rental revenue for August 2012, the first, partial month of operations after re-opening, was $69,384.72.[27]  That amount was $3,587.72 more than (or 5.45% above) the projected revenue target of $65,798 for the month.[28]

Revenues for the months of September and October 2012 were significantly below expectations, however.  For example, September's aggregate room rental revenue of $148,311.97[29] represented a –$59,541.03 (or 28.6%) shortfall from the projected revenue target of $207,853.[30]  October's gross room rental revenue of $187,058.07[31] represented an even greater deviation from projections:  it was

---

[25] *See* doc. no. 22-2 (Yedla Affidavit), ¶ 23 ("These budget figures were set by employees of YMC, with input from employees of Enterprise Lodging, including Thrower."); and doc. no. 22-11 (Yedla Deposition), at 27 (testifying that monthly revenue targets were established by Kristy Anderson (Yedla Management's executive vice-president), plaintiff, and Natasha Lawrence (the hotel's director of sales)).

[26] Doc. no. 22-1 (Plaintiff's Deposition), at 97 (testifying that she looked at the month-end revenue reports "every day").

[27] *Id.* at 98 ("[T]he room revenue in August of 2012 was $69,384.72[.]") (alterations supplied); *see also* doc. no. 22-12 (Enterprise Lodging 2012 Income Statement), at ECF 1 & Aug. Col. (recording same amount as the aggregate monthly room rental revenues).

[28] Doc. no. 22-1 (Plaintiff's Deposition), at 102 (testifying that $65,798 "was our projected" room rental revenue target).

[29] *See* doc. no. 22-12 (Enterprise Lodging 2012 Income Statement), at ECF 1 & Sept. Col. (recording $148,311.97 as the aggregate monthly room rental revenues).

[30] *See* doc. no. 22-1 (Plaintiff's Deposition), at 103 (confirming that $207,853 was the aggregate room rental revenue projection for September).

[31] *See* doc. no. 22-12 (Enterprise Lodging 2012 Income Statement), at ECF 1 & Oct. Col. (recording $187,058.07 as the aggregate monthly room rental revenues); *see also* doc. no. 22-1 (Plaintiff's Deposition), at 104 (confirming the same amount).

–$99,644.93 (or 34.75%) below the anticipated target of $286,703.[32]

Plaintiff contended that the hotel's failure to meet projected revenue amounts in those two months was due, in part, to the uninhabitable state of some of the rooms.[33] For example, as many as 37 of the hotel's 149 guest rooms (24.8%) were not capable of occupancy during the month of September.[34] On the other hand, only four of the hotel's rooms (2.68%) remained in a condition that prevented occupancy by October 29, 2012, the date on which plaintiff's employment was terminated.[35]

Plaintiff also blamed the poor revenue performance on such factors as:  the failure of the hotel's sales manager to mount an "active sales effort," to "go out and make sales calls";[36] the residual negative opinion of the hotel that carried over from the years during which it had been operated as a "Radisson®" franchise;[37] her inability

---

[32] *See* doc. no. 22-1 (Plaintiff's Deposition), at 104 (confirming that $286,703 was the aggregate room rental revenue projection for October 2012).

[33] Doc. no. 22-1 (Plaintiff's Deposition), at 98-99.

[34] *Compare id*. at 99 ("guessing" that "probably eight to ten rooms" *on the "ground floor"* of the hotel "were out of order" during September 2012) (emphasis supplied), *with* doc. no. 22-7 (Sept. 5, 2012 Email from Plaintiff to Stuart Newmark) (stating that "As of this morning we had 23 rooms that were out of order," and later that "There are . . . 37 rooms out of order as of now") (ellipsis supplied).  *See also* doc. no. 43 (Supplement to Defendant's Motion for Summary Judgment), ¶ 2 ("The DoubleTree Suites Huntsville south has one hundred forty-nine (149) guest rooms.").

[35] *See* doc. no. 22-1 (Plaintiff's Deposition), at 99 (testifying that "[a]ll but four rooms were operational when I left" in October 2012) (alteration supplied).

[36] *See id*. at 104; *see also id*. at 110 ("I just wanted her [the hotel's sales manager] to go out and make sales calls.") (alteration supplied).

[37] *Id*. at 104-105.

to have "a little bit more input" on room rental rates;[38] the fact that "a lot of money" had to be refunded to customers due to deficiencies in the condition of their rooms;[39] and, her assertion that the monthly revenue projections were "way too high."[40]

**D**.   **Plaintiff's September Performance Evaluation**

A meeting to discuss the hotel's failure to meet income projections, as well as other "things that were going on," was held on September 13, 2012.  It was attended by, among others:   plaintiff; Yedla Management's Executive Vice President of Operations, Stuart Newmark; Yedla Management's Accounting Manager, Kristy Anderson;[41] and, the hotel's Sales Manager, Natasha Lawrence.[42]   Newmark subsequently addressed a five-page, single-spaced, typewritten memo to plaintiff, recapitulating the topics discussed during that meeting, and outlining a long, bullet-

---

[38] *Id*. at 105 ("I believe we could have made more revenue had I been allowed to have had a little bit more input on the rate structure — rate level of the rooms and stuff.").

[39] *Id*. ("And we refunded a lot of money because of different issues that was going on in the hotel with the soap dishes and things falling off [and] hitting people.") (alteration supplied).

[40] Doc. no. 22-1 (Plaintiff's Deposition), at 106; *see also id*. at 107 (reiterating that "the budget was overprojected," and "they knew it was way too high for the projection").

[41] Defense counsel contended during oral arguments on the subject motion that Accounting Manager Kristy Anderson was not employed just by Yedla Management, but by all of the hotels managed by that company in north Alabama.  Ms. Anderson denied during her deposition that she was an employee of Yedla Management Company, but was then employed by "Enterprise Lodging of Huntsville, Highlander Staffing, Wiring Hotel Group I, Wiring Hotel Group II, [and] Vision Hospitality I."  Doc. no. 22-10 (Anderson Deposition), at 5 (alteration supplied).  She added that she received paychecks from those entities, as well as others:  "I actually get — don't quote me on the number — eight or nine different paychecks every two weeks."  *Id*. at 7.

[42] Doc. no. 22-1 (Plaintiff's Deposition), at 78 (alteration supplied).

point list of "follow up action items and expectations."[43]  The memorandum bore a

typed date of September 25, 2012, but it was not emailed to plaintiff until October 1,

2012.[44]  Pertinent portions read as follows:

> Vickie[:]   the following shall serve as a recap of our discussions
> including follow up action items and expectations.
>
> ### *Meeting with Team Leaders*
> . . . .  The following were some of the areas where you need to continue
> to work on and enhance as the property evolves.
>
> - Consistency across the board and seeing things through to full completion.
> - Enhanced communication is needed.  Everyone should be on the same page.
> - Ensure all are fully aware of YMC SOP's [*standard operating procedures*].  It was apparent that most of those in attendance were not aware of the policies and procedures of our company and as such what they were responsible for adhering to as a leader of the team.
> - *Continue to be aware of the importance of fostering a culturally diverse team.*[45]  This includes a focus on recruiting as required individuals from the local area. *At the end of the day we will always choose the most qualified candidate(s)*[;] *however[,] being able to draw from a larger pool of applicants is*

---

[43] Doc. no. 22-14 (Sept. 25, 2012 Memo from Stuart Newmark to Plaintiff).

[44] *See* doc. no. 22-1 (Plaintiff's Deposition), at 79.

[45] During the Sept. 13, 2012 staff meeting that precipitated this memo, the Sales Manager for the DoubleTree Suites by Hilton hotel, Natasha Lawrence, a black female, angrily complained about plaintiff's disproportionate hiring of white employees who were from the Union Grove community south of the Tennessee River, near plaintiff's residence. *See, e.g.*, doc. no. 22-2 (Yedla Affidavit), ¶¶ 24-25; doc. no. 22-10 (Anderson Deposition), at 15-16.  Plaintiff was not disciplined, but was instead instructed by Stuart Newmark, both verbally and in this paragraph of his memo, "to be aware of the importance of fostering a culturally diverse team" and, whenever possible, to hire only "the most qualified candidate(s) . . . from a larger pool of applicants."  Doc. no. 22-2 (Yedla Affidavit), ¶ 26.

*encouraged and generall* [*sic*] *good business practice*.

\* \* \* \*

### MBWA & Guestroom Inspections

- Vickie[:] please stay visible throughout all areas of the hotels [*sic*] following the SOP on MBWA (Management by Walking Around) and meeting the minimum quota for inspecting rooms. This is an important period as you know as we build awareness and trial.  As the saying goes you only get one chance to make a great first impression and so the time is now to be up and about as often as possible inspecting, interacting with guests and associates etc.

\* \* \* \*

### GM Expectations

- Vickie[:] during lunch Kristy and I had a candid conversation with you and mentioned that *we have received comments that at times you may not be as effective in your communication and that your approach/style can be perceived as being too harsh*.  I know that there are always two sides to every situation[;] however *we asked that you think about it and if necessary modify your style to one that*[,] *while holding team members accountable*[,] *is seen as respectful and objective*.  The leader as you know is always under the microscope and must be held to a very high standard.
- Further communication with the F&B [Food and Beverage] team is one that perhaps has not gotten off on the best footing and so I ask that you also seek ways to create a greater sense of partnership and communication with the F&B team overall.[46]

---

[46] It is clear that plaintiff had a temperamental relationship with Chef James Boyce, the hotel's restauranteur.  Doc. no. 22-1 (Plaintiff's Deposition), at 72; doc. no. 22-10 (Anderson Deposition), at 37 ("[Plaintiff] did not get along with the third party running the restaurant, which was Chef Boyce.") (alteration supplied); doc. no. 22-11 (Yedla Deposition), at 18.  As part of the re-branding, the hotel remodeled its restaurant space for lease as a first class restaurant to local chef, James Boyce.  Doc. no. 22-2 (Yedla Affidavit), ¶ 9.  She explained that she got along with Boyce

- *Our expectations for the DoubleTree Suites are very high as there is a lot riding on the success of this hotel.  As the leader of the property you need to be on top of all of the issues, be a highly effective communicator and collaborator*[,] *and be the champion of the brand* (both DoubleTree and YMC).  Following up on assignments and requests in an expeditious manner . . . should also always remain high on your list.

Opening a hotel as we have discussed in the past is never an easy feat.  The priorities during opening change[] once the hotel is open.  Well we are there now and the focus and objectives should always be pursued with a high degree of urgency and ["]make it happen["] philosophy.  Carry the flag high and proud even when there may be frustrating days and moments.  *Never ever let your personal feelings or emotions be obvious to those around you*[,] *especially if your actions may be perceived as less favorable or critical with a certain situation or individual*.  Always endeavor to take the high road, be solution oriented[,] and always a strong advocate of the company, brand[,] and direction.  Behind the scenes and one on one it is fine to express differences of opinion; it fact it is encouraged.  As I have said before it is perfectly fine for individuals working together to be able to agree to disagree.

\* \* \* \*

Doc. no. 22-14 (Sept. 25, 2012 Memo from Stuart Newmark to Plaintiff), at 1-5

(boldfaced underscored emphasis in original, all other emphasis, ellipses, footnotes,

and alterations supplied).

## E.   **Plaintiff's Relationship With Krishna Nagalla**

The statement emphasized in the last paragraph of Stuart Newmark's

---

"okay unless he yelled at me."  Chef Boyce complained to Stuart Newmark regarding the "communication issue" between himself and plaintiff, and that prompted this paragraph of the memo.  *See* doc. no. 22-11 (Yedla Deposition), at 20.

September 25th memo to plaintiff quoted immediately above (admonishing plaintiff to "*Never ever let your personal feelings or emotions be obvious to those around you*[,] *especially if your actions may be perceived as less favorable or critical with a certain situation or individual*") appears to refer to her contentious relationship with the hotel's Purchasing Manager, Krishna Nagalla. Plaintiff contends that Nagalla, a male native of India, discriminated against her based upon her gender and race.[47] Nagalla frequently "questioned" plaintiff on "everything" she procured for the hotel, regardless of whether it was blankets, toilet paper, or training materials.[48] According to plaintiff, Nagalla had a "trust issue": she "had to beg and plead" to purchase anything needed "to get that hotel ready to open."[49] That lack of trust was not peculiar to plaintiff, however. Instead, Nagalla "did not trust anybody."[50] Nagalla also "yelled at" and "cussed" plaintiff; but, again, that behavior was not

---

[47] *See* doc. no. 22-1 (Plaintiff's Deposition), at 41, 89-90; doc. no. 31 (Plaintiff's Brief: Statement of Undisputed Facts), ¶ 5.

[48] Doc. no. 22-1 (Plaintiff's Deposition), at 38-39.

[49] *Id*. at 40. Accounting Manager Kristy Anderson explained that, when a "purchase order would come in . . . [Krishna Nagalla] would shop around for the best price. . . . [T]hen he would place the order or tell [plaintiff] to place the order if it was something they could do down there [*i.e.*, at the hotel]. He would make sure that what they were ordering were [*sic*] within the standards. . . ." Doc. no. 22-10 (Anderson Deposition), at 44-45 (alterations and ellipses supplied).

[50] Doc. no. 22-1 (Plaintiff's Deposition), at 40; *see also id*. at 42 ("Well, he had a trust issue with everybody."). Even so, there may have been a more specific basis for Nagalla's attitude toward plaintiff: her friendship with Joseph Maroney, who had worked for Nagalla and the Yedlas for many years, and stolen "a bunch of money." *Id*. at 43. Plaintiff speculates that, as a result of that, Nagalla "had huge trust issues with me and discriminated against me. And that's the reason he didn't want me to have control of the supplies that we needed." *Id*.

peculiar to her.[51]

Plaintiff complained about Nagalla's behavior in emails addressed to Stuart Newmark.  In one, she alleged that Nagalla had "yelled at" her for requesting hotel supplies.[52]   Newmark responded that he was available to *discuss* plaintiff's frustrations, but the record does not indicate that any official *action* was taken by him in response to her complaint.[53]   In a later email, plaintiff asserted that, following another disagreement about the procurement of supplies, Nagalla had made her

> feel like I was [an] irresponsible 2 year old and scum on the bottom of [his] shoes.  He did say he was having more [vacuum cleaners] brought here in a little while however.  He interrupts and does not give you a chance to say a word [*sic*] you know that too.
>
> . . . .
>
> I know what needs to be done and how to secure things [*sic*] I am concerned about everyone opening up storage rooms and leaving them open too.  It is not Becky doing that. I am told it is Giri but not sure, anyway I just need to vent to you because that is better than having my blood pressure boil because Krishna thinks I am a [*sic*] idiot..... [*sic*] and humiliates me.
>
> Please don't say anything to him because he clearly understands

---

[51]  *Id*. at 40-41.  Defendant's brief argues that, in his role of Purchasing Manager, "Mr. Nagalla was specifically directed by Enterprise Lodging to be very strict in regard to spending and was generally known to Enterprise Lodging, and its employees, to be very harsh to all the Hotel's employees and even its ownership on occasion."  Doc. no. 22 (Defendant's Brief:  Undisputed Material Facts), ¶ 16.

[52]  *See* doc. no. 22-1 (Plaintiff's Deposition), at 63-64

[53]  *Id*. at 62.  It is clear, nevertheless, that plaintiff did not complain that she was being treated poorly or differently because of her race or gender.  *See id.* at 65-68.

where I am coming from but it will only make matters worse.  I have offered my 4 wheel drive long wheel base truck to go pick up the stuff. I am capable of that too.  I am not going to take anything.  I am not Joseph Maroney and every General Manager should not suffer because of a few bad apples.  I am not a thief, I was known at every property I have ever worked at for catching thieves and terminating them.  No need to respond, just venting to you.  I am going to do a time line to Vernon, Krishna and copy you of [*sic*] how we would like to proceed with the rooms.

Doc. no. 22-4 (July 25, 2012 Email) (all alterations supplied, ellipsis in original).

Plaintiff admitted that she never lodged a formal complaint asserting that Nagalla's treatment was based upon either her gender or race.[54]  Moreover, the record reflects that Yedla Management "received complaints about Krishna from almost every single employee that worked at every one of [the hotels managed by the company] — male, female, white, black, [and] Hispanic. . . ."[55]  Satya Yedla described Nagalla as a person who was in "conflict with everybody," *including* Satya himself, his brother, Srinath Yedla, and his father, Dr. K. Rao Yedla.[56]  Plaintiff's succinct description was that Krishna Nagalla is "just a butt."[57]

Despite the unhappy relationship between plaintiff and Krishna Nagalla, he

---

[54] *Id*. at 65-66; *see also id*. at 67-68 ("**Q**. . . . Did you ever tell anybody at Yedla Management that you were being treated differently because you are a woman, because I don't see it here?  **A**.  Not specifically a woman.") (ellipsis supplied).

[55] *Id*. at 68 (ellipsis and alterations supplied).

[56] Doc. no. 22-11 (Yedla Deposition), at 47 (alteration supplied).  Kristy Anderson explained that she and Stuart Newmark both regarded Nagalla as a "pain in the ass." Doc. no. 22-10 (Anderson Deposition), at 30.

[57] Doc. no. 22-1 (Plaintiff's Deposition), at 75.

was not her supervisor, he possessed no power to discipline her, and he did not

participate in the decision to terminate plaintiff's employment.

## F.   Plaintiff's Relationship With Stuart Newmark

Plaintiff contends that Stuart Newmark, a white male, discriminated against her

because of her gender and race.[58]   In that regard, she testified that Newmark treated

her differently "because he would address the men before he would address me.

Oftentimes[,] whenever there were e-mails and things being sent to him [by me], he

wouldn't even answer me back.  So in that way he discriminated against me, I would

think."[59]

---

[58] *Id.* at 45.  See also the following at page 89 (line 18) through page 90 (line 12) of plaintiff's deposition:

> Well, like I said, I feel that Stuart discriminated against me by not taking care of Krishna, who I constantly complained about the way he was treating me.  *So you don't treat another male more differently than you do the female.*  No matter who he is, they did not take care of the way he was treating me.  So that would be discrimination, in my opinion, if someone doesn't address the male that's treating you wrong and you have asked them to do something about it on several occasions and said, he, he's treating me like the scum on the bottom of my shoe.  And I'm constantly being told well, you know his [Krishna Nagalla's] name means God, and we can't do anything because Dr. Rao has vowed to take care of him for the rest of his life so you are just going to have to deal with it."  [*sic*]  I was told that almost from day one.  [Emphasis and alteration supplied.]

Despite plaintiff's complaints about Stuart Newmark's failure to intervene, the record indicates that only Dr. K. Rao Yedla possessed the authority to fire Krishna Nagalla.  *See*, *e.g.*, doc. no. 22-10 (Anderson Deposition), at 40-41.

[59] Doc. no. 22-1 (Plaintiff's Deposition), at 26 (alterations supplied).  Plaintiff went on to say that she felt that Newmark often usurped her authority as general manager, but failed to clearly indicate any particular instances in which he prevented her from performing her duties. *Id.*

19

Plaintiff later contradicted herself, however, when stating that she did not believe that Newmark had discriminated against her " because [she] was a woman, but because [she] had said something about Krishna treating [her] the way he had."[60]

## G.    Plaintiff's Termination

Plaintiff was terminated on October 29, 2012, a little over six months after being hired as general manager of the DoubleTree Suites Huntsville-South hotel.[61] On that day, Kristy Anderson entered plaintiff's office and, while seated in plaintiff's presence, called Stuart Newmark on plaintiff's telephone.  Together, Anderson and Newmark explained to plaintiff that she was being fired.[62]  Anderson later testified that plaintiff's termination was the result of a joint decision by her and Stuart Newmark.[63]  Even so, plaintiff believes that it was Stuart Newmark who actually made the decision to fire her, because she had "said something about Krishna [Nagalla] treating me the way he had and nothing was being done about it."[64]

The reasons stated by Newmark for plaintiff's termination during the telephone conference were:  she "was making too much money[;] and the hotel wasn't making

---

[60] *Id.* at 27 (alterations supplied).

[61] *Id.* at 17.  Plaintiff was not aware of Stuart Newmark firing any other person during her stint of employment.  *Id.* at 31.

[62] *Id.* at 81.

[63] Doc. no. 22-10 (Anderson Deposition), at 30.

[64] Doc. no. 22-1 (Plaintiff's Deposition), at 27-28 (alteration supplied).

the money they expected it to make[;] and [she] was not a good fit for the company's culture."[65]   When Kristy Anderson was asked to explain her understanding of the statement that plaintiff did not "fit the company culture," Anderson said that plaintiff "did not get along with the third party running the hotel's restaurant [Chef James Boyce]," and the hotel's revenues had not reached budgeted expectations.[66]

Satya Yedla testified that plaintiff was terminated because:  she had "an issue with communication and follow through and being visible in all the departments";[67] standard operating procedures "weren't being enforced" by plaintiff; and, her salary exceeded the level of experience they had expected from her.[68]

For her part, plaintiff believed that she had been terminated because of the combative nature of her "relationship with Krishna [Nagalla,] and how he treated and discriminated against me and others."[69]

On November 27, 2012, one month after plaintiff's termination, she sent the following email to Stuart Newmark:

Dear Mr. Newmark,

I appreciate the opportunity you gave me to work for your

---

[65] *Id.* at 32 (alterations supplied).

[66] Doc. no. 22-10 (Anderson Deposition), at 37 (alteration supplied).

[67] Doc. no. 22-11 (Yedla Deposition), at 18.

[68] *Id.*

[69] Doc. no. 22-1 (Plaintiff's Deposition), at 35 (alteration supplied).

company. Unfortunately, due to the circumstances of my termination, I have no choice but to conclude that it is due to my gender, race and Southern Heritage, in violation of my federally protected rights guaranteed by Title VII of the Civil Rights Act of 1964. I am requesting that I be reinstated as an employee, with back pay, and with appropriate measures in place to prevent further occurrences of discrimination and harassment.

I have read and clearly understand the document that was presented to me by Kristy Anderson after you told me that I was terminated over the phone. I cannot agree with the termination, or sign any document that proposes to waive my federally protected rights.

Your reason for my termination, that I was not a good fit for Yedla Management Companies [*sic*] "culture," is consistent with the bias and harassment shown by management toward females and Caucasian employees of southern heritage. When I was hired [,] you certainly indicated that your company had the money to afford my salary regardless of the hotel's performance. It is unfortunate that the company's reputation has continued to cause the negative performance in business for the Doubletree [*sic*] Suites by Hilton Huntsville-South. As you are aware[,] Srinath Yedla sought me out due to my good reputation, and it was clear your company was aware of my ability as General Manager. I do feel that I could make a difference and the business would be successful if I was allowed to do my job. As such, I must insist on reinstatement, under conditions that will allow me to perform free from harassment and discrimination.

Doc. no. 22-15 (Plaintiff's Nov. 27, 2012 Email to Stuart Newmark) (alterations supplied).[70] Shortly after sending the foregoing email, plaintiff filed a formal charge of discrimination with the Equal Employment Opportunity Commission.[71]

---

[70] Despite asking for her job back, plaintiff testified in her deposition that she did not believe she would "be able to work together" with "the Yedlas" again. *Id.* at 33.

[71] Doc. no. 22-16 (EEOC Charge).

Jesse Martinez, a Polynesian male from the island of Guam, was hired by Yedla Management as "interim" general manager of the hotel in November of 2012.[72]  He served in that capacity for nearly two years, departing in August of 2014 for another position in Florida.[73]  He was replaced by Paula Evans, a white female, who left in June of 2015, after also finding a job in Florida.[74]  Currently, Lars Schrieder, a white German male, is the hotel's general manager.[75]

## IV.  DISCUSSION

Plaintiff alleges that she was subjected to a hostile work environment, and was discharged from her employment because of her "gender, female, and her race, Caucasian, and in retaliation for engaging in protected activity."[76]  She contends that defendant thereby violated Title VII of the Civil Rights Act of 1964, as amended, 42

---

[72] Doc. no. 22-1 (Plaintiff's Deposition), at 29-31.  Jessie Ramirez worked as general manager of "the SpringHill" hotel in Huntsville, Alabama prior to coming to work at the DoubleTree Suites.  Doc. no. 22-11 (Yedla Deposition), at 76.  Satya Yedla testified that Martinez was making a significantly lower salary than plaintiff. *Id.*

[73] Doc. no. 22-10 (Anderson Deposition), at 19.

[74] *Id.* at 20.  The record contains no information concerning Evans' performance as general manager while at the hotel.  Even so, Satya Yedla testified that her salary was less than $80,000.  Doc. no. 22-11 (Yedla Deposition), at 75.

[75] Doc. no. 22-10 (Anderson Deposition), at 18.  Satya Yedla testified that Mr. Schreider earns a salary of $83,000 "because he's very experienced and has increased the sales [of the hotel] measurably." Doc. no. 22-11 (Yedla Deposition), at 75 (alteration supplied).

[76] Doc. no. 1 (Complaint), ¶ 14.  Plaintiff, in her EEOC charge, complained that she also was discriminated against on the basis of her "Southern heritage."  Doc. no. 22-16 (EEOC Charge), at ECF 3.  Even so, plaintiff did not allege that she was discriminated against on the basis of her "Southern heritage" within her complaint, nor did she argue it within her brief.  Accordingly, the court will not address any claims for discrimination based on plaintiff's "Southern heritage."

U.S.C. §§ 2000e *et seq*. ("Title VII"), and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1) (alteration supplied).   In contrast, § 1981 addresses only racial discrimination. *See, e.g.*, *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment *on the basis of race*.") (emphasis supplied); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436 (1968) ("In light of the concerns that led Congress to adopt it and the content of the debates that preceded its passage, it is clear that the Act was designed to do just what its terms suggest:  to prohibit all *racial discrimination*, whether or not under color of law. . . .") (emphasis supplied); *Little v. United Technologies*, 103 F.3d 956, 961 (11th Cir. 1997) ("It is well-established that § 1981 is concerned with *racial* discrimination in the making and enforcement of contracts.") (emphasis in original) (citations omitted).

Even so, "[b]oth of these statutes have the same requirements of proof and use the same analytical framework," and courts accordingly "address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."

*Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (alteration supplied); *see also*, *e.g.*, *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (observing that race discrimination claims brought under Title VII and § 1981 "are subject to the same standards of proof and employ the same analytical framework"); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("When section 1981 is used as a parallel basis for relief with Title VII against disparate treatment in employment, its elements appear to be identical to those of [Title VII] section 706 [42 U.S.C. § 2000e-5].") (citations omitted, alterations supplied).

## A.   Defendant's Contention That It Was Not Plaintiff's Employer

Defendant's primary contention has two parts:  *i.e.*, it was not plaintiff's employer; and, even if it were, the company did not employ the number of persons required to subject it to liability under Title VII.[77]  Defendant insists that plaintiff was an employee of Enterprise Lodging — a limited liability company that, as previously noted, is not now, nor has it ever been, a party.  Defendant points to the fact that each of plaintiff's paychecks, as well as her 2012 W-2 form and her 2012 federal and state income tax returns, uniformly stated that she was an employee of Enterprise Lodging.[78]  Moreover, the records presented to this court indicate that Yedla

---

[77] *See* doc. no. 22 (Defendant's Brief), at 11-12.

[78] *See* doc. no. 22-1 (Plaintiff's Deposition), at 46-47; doc. no. 22-18 (Plaintiff's 2012 W-2 Form); doc. no. 22-17 (Plaintiff's 2012 Tax Returns), at ECF 4.  **Note**:  "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents

Management employed only four persons during the period relevant to plaintiff's claims,[79] whereas thirty-five or more persons were employed by plaintiff as staff for the DoubleTree Suites by Hilton hotel.[80]

Even so, plaintiff initially was identified as a candidate for employment as general manager of the remodeled DoubleTree Suites by Hilton hotel by Srinath Yedla,[81] who was one of the three owners of Yelda Management.[82]   Further, the March 11, 2012 letter offering plaintiff employment as General Manager of that hotel was typed on stationery bearing Yedla Management letterhead and logo, and was signed by that company's Executive Vice President of Operations, Stuart Newmark.[83]

---

electronically (*i.e.*, "Electronic Case Filing").  *See The Bluebook:  A Uniform System of Citation*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010).  When this court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

[79] The four persons unquestionably employed by Yedla Management include the three owners of that corporation (Dr. K. Rao Yedla and his two sons, Satya and Srinath) and Stuart Newmark. That number does not comply with Title VII's definition of the term "employer," which requires proof of "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  42 U.S.C. §§ 2000e(b).

[80] Plaintiff testified that she hired "somewhere close to 35 to 40 employees," with the largest portion of those hires, "10 or so," being housekeeping staff, and "28 maybe" being non-housekeeping staff.  Doc. no. 22-1 (Plaintiff's Deposition), at 50-51.

[81] Satya Yedla testified that it was his brother, Srinath, who "thought that [plaintiff] would be a good solution to getting a GM in place quickly."  Doc. no. 22-11 (Yedla Deposition), at 19 (alteration supplied).

[82] *See* doc. no. 22-1 (Plaintiff's Deposition), at 44; doc. no. 22-2 (Yedla Affidavit), ¶ 2.  It is clear that at some times during plaintiff's employment at the hotel, Srinath Yedla possessed authority over plaintiff's work.  *See* doc. no. 22-11 (Yedla Deposition), at 71.

[83] *See* doc. no. 32-1 (Plaintiff's Affidavit), at ¶ 1; *id.* at ECF 3 (Employment Offer); doc. no. 22-11 (Yedla Deposition), at 7.

The first paragraph of that letter states that the offer was extended "on behalf of the DoubleTree Suites Huntsville-South in Huntsville, Alabama," and does not mention Enterprise Lodging within the four corners of the document, either by name or implication.  The third paragraph of the offer letter states that plaintiff would report to "the Executive Vice President of Operations for *Yedla Management Company.*"[84] The final paragraph of the same letter says that:  "We all look forward to welcoming you to *Yedla Management Company* and to the DoubleTree Suites Huntsville-South."[85]  Dr. K. Rao Yedla not only is the major stockholder of Yedla Management Company, Inc., but he also has identified himself as "Manager" of Enterprise Lodging.[86]   Plaintiff's employment was terminated by Yedla Management's Executive Vice President of Operations, Stuart Newmark.

Finally, Title VII's definition of the term "employer" reads as follows:

> (b) The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, *and any agent of such a person*, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a

---

[84] Doc. no. 32-1 (Plaintiff's Affidavit), at ECF 3 (Employment Offer) (emphasis supplied).

[85] *Id*. (emphasis supplied).

[86] Doc. no. 22-3 (Jan. 4, 2002 Deed from Enterprise Lodging of Huntsville, L.L.C., to Main Street South, Ltd., recorded on Feb. 13, 2002, in Deed Book 1014, at Page 11, Probate Records of Madison County, Ala.).

> bona fide private membership club (other than a labor organization)
> which is exempt from taxation under section 501(c) of Title 26, except
> that during the first year after March 24, 1972, persons having fewer
> than twenty-five employees (and their agents) shall not be considered
> employers.

42 U.S.C. §§ 2000e(b) (emphasis supplied).   Thus, even granting defendant's

argument that Yedla Management Company, Inc., was not plaintiff's "employer," that

entity certainly was the "agent of" her actual employer, Enterprise Lodging of

Huntsville, L.L.C.  Applying the agency principles ratified by the Supreme Court's

decision in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 754-55 (1998), it is

clear that Yedla Management was acting as an "agent of" Enterprise Lodging:  the

entity that actually owned the hotel and employed plaintiff.

Plaintiff may recover under Title VII from an agent of an employer sued in its

official capacity, regardless of whether the actual employer is a party to the action.

*See*, *e.g.*, *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).  *Cf.*, *e.g.*,

*Prescott v. Independent Life and Accident Insurance Co.*, 878 F. Supp. 1545, 1552

(M.D. Ala. 1995); *Bahadirli v. Domino's Pizza*, 873 F. Supp. 1528, 1534 (M.D. Ala.

1995).  *See also*, *Williams v. City of Montgomery*, 742 F.2d 586, 589 (11th Cir. 1984)

(observing that, "[w]here the employer has delegated control of some of the

employer's traditional rights, such as hiring or firing, to a third party, the third party

has been found to be an 'employer' by virtue of the agency relationship") (alteration

supplied, citations omitted).

Even if this court should be incorrect in reaching that conclusion, the following discussion will establish that plaintiff still cannot recover.

## B.   Discriminatory Termination

Plaintiff presents no direct evidence of discrimination on the basis of either her gender or race in the termination of her employment.[87]  Therefore, to avoid summary judgment, she must satisfy the burden-shifting analytical framework for disparate treatment claims defined by the Supreme Court in a trilogy of decisions, beginning with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  The analytical

---

[87] Only the most blatant remarks indicating a discriminatory animus constitute direct evidence.  *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *Wright v. Southland Corporation*, 187 F.3d 1287, 1293-1303 (11th Cir. 1999); *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).  Further, "[t]o amount to direct evidence, a statement must:  (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal a blatant discriminatory animus."  *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001) (alteration supplied).

"Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (citing *Carter v. City of Miami*, 870 F.2d 578, 580-81 (11th Cir.1989)).  Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar *McDonnell Douglas* paradigm for circumstantial evidence claims.

*Equal Employment Opportunity Commission v. Joe's Stone Crab*, 220 F.3d at 1263, 1286-87 (11th Cir. 2013).  Here, nothing in the record indicates that Stuart Newmark or Kristy Anderson acted with blatant discriminatory animus in terminating plaintiff.

framework developed by those opinions has three steps, the goal of which is
"'progressively . . . sharpen[ing] the inquiry into the elusive factual question of
intentional discrimination.'"  *Hicks*, 509 U.S. at 506 (quoting *Burdine*, 450 U.S. at
255 n.8) (alteration and ellipsis in original).[88]

Plaintiff bears the initial burden of establishing a *prima facie* case of intent to
discriminate.  *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 252-53;
*Hicks*, 509 U.S. at 506.   The demonstration of a *prima facie* case "creates a
presumption that the employer unlawfully discriminated against the employee."
*Burdine*, 450 U.S. at 254.  The effect of the presumption is to shift to the employer
the burden of *producing*, but not *proving*, some legitimate, nondiscriminatory reason
for the contested employment action.  *See McDonnell Douglas*, 411 U.S. at 802.
"The defendant need not persuade the court that it was actually motivated by the
proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue
of fact as to whether it discriminated against the plaintiff."  *Burdine*, 450 U.S. at
254-55 (citation and footnote omitted).  If the defendant-employer carries its burden
of production, "the presumption raised by the *prima facie* case is rebutted," *id.* at 255,

---

[88] The analytical framework applicable to both Title VII and § 1981 claims is the *McDonnell Douglas* burden-shifting framework, which places the burden of establishing a *prima facie* case of either a gender- or race-discrimination on the employee.  *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 767-68 (11th Cir. 2005).

and "drops from the case."  *Id.* at 255 n.10.

At the third level of analysis, "plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted).

> [T]his circuit's post-*Hicks* decisions uniformly hold that once a plaintiff has established a *prima facie* case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law.

*Id.* at 1532 (alteration supplied).

### 1. *Prima facie* elements of a discriminatory discharge claim

A *prima facie* discriminatory discharge claim generally contains four elements of proof: *that is*, a plaintiff customarily must demonstrate (1) that she was a member of a class of persons protected by Title VII or Section 1981 (*i.e.*, her gender and/or race under Title VII, or her race under § 1981); (2) that she was qualified for the employment position she held; (3) despite plaintiff's qualifications, defendant terminated her employment; and (4) following plaintiff's discharge, the defendant either replaced her with someone outside her protected class, or retained other

employees who were not within plaintiff's protected class, but who possessed comparable or lesser qualifications.  *See, e.g., Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 101 (11th Cir. 1982).

Defendant did not dispute that plaintiff had satisfied the elements of a *prima facie* case.  As a Caucasian female, plaintiff is a member of classes protected by both Title VII (white females) and § 1981 (whites).[89] Construing the facts in the light most favorable to plaintiff, she also was qualified to perform the duties of general manager. Finally, plaintiff was replaced by Jessie Martinez, a Polynesian male, who is outside her protected classes.

Accordingly, the burden shifts to defendant to proffer a non-discriminatory reason for plaintiff's termination.  Yedla Management "must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]."  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981) (alteration supplied).

## 2.   Defendant's non-discriminatory reason for termination

Defendant proffers evidence that plaintiff was fired because the hotel was not meeting projected revenues,[90] and her act of hiring several white persons who resided

---

[89] *See, e.g. McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) (holding that section 1981 afforded protection against discrimination for all races, including whites).

[90] *See, e.g,* doc. no. 22-2 (Yedla Affidavit), ¶ 27 ("In October 2012, the Hotel's room rental performance, which is its primary source of revenue, continued to fall drastically off the budgeted

near her in Union Grove, Alabama, south of the Tennessee River, demonstrated that "she did not fit with the Hotel's diverse culture and other employees."[91]  "An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate nondiscriminatory reason for termination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citing *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)).

Thus, defendant has rebutted plaintiff's *prima facie* case, the presumption of discrimination drops from the case, and the burden shifts back to plaintiff to establish that defendant's proffered nondiscriminatory reasons are pretextual excuses for a discriminatory motive.

### 3. Pretext

When an employer produces sufficient evidence to rebut the presumption of discrimination raised by demonstration of a *prima facie* case, a plaintiff's failure to produce sufficient evidence, including the previously produced evidence establishing a *prima facie* case, to permit a reasonable jury to find that the employer's articulated reasons are not worthy of belief justifies the entry of summary judgment in favor of

---

pace ($286,703.00 projected vs. $187,058.07 actual, makes a difference = $99,644.93 or 35% below the projection).").

[91] *Id.*, ¶ 28 ("On or about October 29, 2012, Thrower's employment at the Hotel was terminated because of the Hotel's poor performance under her guidance and because she did not fit with the Hotel's diverse culture and other employees.").

the employer.  *See*, *e.g.*, *Howard v. BP Oil Company, Inc.*, 32 F.3d 520, 526 (11th Cir. 1994) (explaining that summary judgment is proper where a plaintiff fails to produce evidence to discredit a defendant's explanation of its action).  "[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its action."  *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989) (alterations and ellipsis in original); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987) (same).

Moreover, a plaintiff cannot establish pretext by merely disagreeing with, or questioning, an employer's stated reason for an adverse employment action.  "Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer."  *Combs*, 106 F.3d at 1543.  Rather, the plaintiff's burden is that of "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct' . . . ."  *Id*. at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)) (alteration supplied).  The plaintiff shoulders that burden by demonstrating "such

34

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (quoting *Sheridan v. E.I. duPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

Plaintiff responds to defendant's stated reasons for terminating her employment by arguing, on the one hand, that she performed well when given sufficient resources and control over her work and, alternatively, that the revenue targets against which she was measured were unfairly set in view of the poor condition and reputation of the hotel — *i.e.* the ongoing construction and renovation work.[92]

Plaintiff cannot deny that the hotel's gross revenues for September and October in 2012 fell well below targeted projections. Although she now argues that the revenue targets she was measured against were unfair, she actively participated in setting those targets both before and after the hotel was opened to guests.[93] Furthermore, although plaintiff asserts her "performance was high where she was given control and [resources,]"[94] she testified that, ultimately, she was placed in

---

[92] Doc. no. 31 (Plaintiff's Brief), at 11-13.

[93] *See* doc. no. 22-1 (Plaintiff's Deposition), at 101, 107 (explaining that plaintiff helped set the budget both before and after opening the hotel to guests).

[94] Doc. no. 31 (Plaintiff's Brief), at 11 (alteration supplied); *see* doc. no. 22-1 (Plaintiff's Deposition), at 104.

charge of and responsible for the overall performance of the sales team and meeting the budget.[95]

Additionally, the record indicates that plaintiff was having difficulty communicating with staff and the third party restauranteur, and complying with the standard operating procedures for comparable hotel properties.[96]  Even though one of Yedla Management's reasons for terminating plaintiff's employment — *i.e.*, that she was "not a good fit" for the company — may be both subjective and vague, there is no evidence that plaintiff's termination was motivated by either her race or gender. Moreover, courts should not second guess the legitimate non-discriminatory business decisions of employers.  *Lee v. GTE Florida*, 226 F.3d 1249, 1253-54 (11th Cir. 2000) (explaining that it is not the role of the courts to "act as a super personnel department that second-guesses employers' business judgments") (citation omitted). A "subjective" reason for an employment decision may be "just as valid" as an objective reason.  *Dunklin v. Montgomery County Board. of Education*, 652 F. Supp. 2d 1226, 1236 (M.D. Ala. 2009) (citing *Chapman*, 229 F.3d at 1033-1034).

Plaintiff has failed to demonstrate that defendant's proffered legitimate, nondiscriminatory reasons for terminating her employment are a mere pretext for

---

[95] *See* doc. no. 22-1 (Plaintiff's Deposition), at 46, 103-107.

[96] *See* doc. no. 22-14 (Sept. 25, 2012 Memo from Stuart Newmark to Plaintiff); doc. no. 22-10 (Anderson Deposition), at 37; doc. no. 22-11 (Yedla Deposition), at 18.

discrimination, and summary judgment is due to be granted on her claims for discriminatory discharge under both Title VII and § 1981.

## C.   Hostile Work Environment

Plaintiff contends that she "was subject to verbal abuse" and "a hostile work environment" because of her race and gender.  A Title VII hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

A *prima facie* hostile work-environment claim requires proof that: (1) plaintiff belonged to a protected group; (2) she was subjected to unwelcome harassment based upon her race and/or gender;[97] (3) the harassment was sufficiently severe or pervasive as to alter the terms or conditions of plaintiff's employment, and created a discriminatory abusive working environment; and (4) plaintiff's employer is liable for the hostile environment under a theory of either direct or vicarious liability.  *See*, *e.g.*, *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The first two *prima facie* elements cannot be disputed.  As a white female,

---

[97] *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002) ("Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment.") (citing *Faragher v. Boca Raton*, 524 U.S. 775, 786–87 & n.1 (1998); and *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986)).

plaintiff belongs to two protected groups. *See Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman.") (alteration supplied). Plaintiff also has testified that she was subjected to aggressive comments and offensive behavior that she found unwelcome.

Even so, there is no evidence indicating that plaintiff was treated differently or worse because of either her race or gender. Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1254 (11th Cir. 1999) (Edmondson, J., concurring) Instead, it prohibits discrimination on the basis of a protected characteristic. *See, e.g.*, *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring).

> My thought is this one: at least when the sexual content of a supervisor's conduct is not obvious, *a plaintiff asserting a claim of sexual discrimination in employment must present some evidence that plaintiff's coworkers, those not of plaintiff's sex, were treated differently and better*. Otherwise, Title VII's *vital* element — discrimination — is read out of the statute. The plaintiff's burden to show that similarly situated employees were treated better is not a heavy one; ordinarily, the plaintiff testifies to that circumstance herself or himself. But that the burden can usually be met easily by a properly motivated plaintiff does not mean that meeting the burden is a meaningless formality or that actual evidence is unrequired. This evidence — evidence of the discrimination — is the heart of the case. And, therefore, courts must allow no fudging on the proof.

*Mendoza*, 195 F.3d at 1253-54 (11th Cir. 1999) (Edmondson, J., concurring) (emphasis added) (footnotes omitted).

It appears that Krishna Nagalla treated virtually all individuals with whom he worked in an unpleasant manner.  He was loud and abusive toward nearly every individual discussed in the record, regardless of race or gender, including his superior, Dr. K. Rao Yedla, and other members of the Yedla family.   Yedla Management had "received complaints about Krishna from almost every single employee that worked at every one of [the hotels managed by Yedla Management Company] — male, female, white, black, Hispanic. . . ."[98] There is no evidence that Krishna Nagalla, or any other employee of Yedla Management, uttered any offensive sexual or racial comments to plaintiff.  Moreover, the record indicates that all instances on which plaintiff complained of Krishna Nagalla's behavior, his comments and behavior were based upon the performance of the hotel or the procurement of supplies, and not upon plaintiff's race or gender.  *Id.*  Perhaps most importantly, plaintiff has failed to establish facts indicating that male or non-white employees were treated more favorably than she was.[99]

---

[98] Doc. no. 22-1 (Plaintiff's Deposition), at 68 (alteration and ellipsis supplied).

[99] The "critical issue," according to the Supreme Court, in establishing a hostile or abusive work environment "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). Stated somewhat differently,

Because plaintiff has failed to demonstrate any unwelcome harassment based upon either her race or gender, summary judgement is due to be granted on her hostile work environment claim.

## D.   Retaliation

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (alteration and ellipsis supplied).[100]

---

> [t]he essence of a disparate treatment claim under Title VII is that an employee or applicant is intentionally singled out for adverse treatment on the basis of a prohibited criterion. . . .  In proving a claim for a hostile work environment due to sexual harassment, therefore, the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment. . . .

*Henson*, 682 F.2d at 903-04 (citations omitted) (alteration and ellipses supplied). "[U]nfair treatment of an employee, standing alone, does not make out a Title VII case; the mistreatment must be because the employee was female." *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1504 (11th Cir. 1985) (Hill, J., concurring in part; dissenting in part) (alteration supplied).

[100] Even though the text of 42 U.S.C. § 1981 does not contain a specific prohibition against retaliation, the Supreme Court has held that retaliation claims asserted in the context of a complaint of racial discrimination, and arising after the effective date of the Civil Rights Act of 1991, are cognizable under that statute. *CROCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008). *See also*,

To establish a *prima facie* case of retaliation, plaintiff must prove three elements:   (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there was a causal linkage between the protected conduct and the adverse employment action.  *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc*., 234 F.3d 501, 507 (11th Cir. 2000).

"Statutorily protected expression" includes *either* the act of complaining to superiors *or* filing written complaints with the Equal Employment Opportunity Commission about any allegedly discriminatory conduct.  *See*, *e.g.*, *Johnson*, 234 F.3d at 507 (citing *Rollins v. State of Florida Department of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).  Plaintiff complained to her supervisor about Krishna Nagalla's offensive behavior, *but she never complained that his conduct was based*

---

e.g., *Webster v. Fulton County, Georgia*, 283 F.3d 1254, 1256 (11th Cir. 2002) (holding that the court has "previously concluded that Section 1981 supports a retaliation cause of action") (citing *Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1409-13 (11th Cir. 1998) (concluding that § 1981 retaliation claims are cognizable after the 1991 amendment to that statute, but explaining that the question of whether a specific claim is cognizable depends upon the specific nature of the retaliation claim); *Jackson v. Motel 6 Multipurpose, Inc*., 130 F.3d 999, 1007 (11th Cir. 1997) (observing that § 1981 retaliation claim lies for a plaintiff's opposition to race discrimination, regardless of whether the plaintiff is personally the victim of that race discrimination); *Pinkard v. Pullman-Standard*, 678 F.2d 1211, 1229 (5th Cir. Unit B 1982) (recognizing that § 1981 claims "may be based upon retaliatory action taken against an employee for the employee's lawful advocacy of the rights of racial minorities").

upon either her race or her gender.  *See Cartwright v. Tacala, Inc.*, No. CIV A 99-W-663-N, 2000 WL 33287445, at *9-10 (M.D. Ala. Nov. 1, 2000) (explaining that, while an employee's express complaints to a supervisor about allegedly discriminatory practices clearly constitutes "protected activity," a vague, nonspecific declaration of "unfair treatment" is not sufficient to constitute "opposition" under Title VII).  "Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII."  *Coutu v. Martin County Board of County Commissioners*, 47 F.3d 1068, 1074 (11th Cir. 1995) (emphasis in original).  Moreover, plaintiff filed her EEOC charge on December 2, 2012, *after* the date on which her employment was terminated.  Therefore, plaintiff cannot claim that she was retaliated against because she filed an EEOC charge.  Accordingly, plaintiff's complaints cannot serve as the basis for a retaliation claim under either Title VII or § 1981.

## V.  CONCLUSION

In accordance with the foregoing discussion, defendant's motion for summary judgment is GRANTED, and it is ORDERED, ADJUDGED, and DECREED that all claims alleged in plaintiff's complaint be, and the same hereby are, DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

**DONE** and **ORDERED** this 24th day of February, 2017.

42

_____
United States District Judge